# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| FISHER SAND & GRAVEL CO., | )<br>)<br>) |
| Plaintiff, | ) |
| vs. | )  2:09-cv-01372-RCJ-GWF |
| CLARK COUNTY, NEVADA et al., | )<br>) |
| | )  **ORDER** |
| Defendants. | )<br>) |

This case arises out of the Clark County Board of County Commissioners' rejection of Plaintiff Fisher Sand & Gravel Co.'s bid on Bid No. 601309-08. That bid is for improvements to a segment of Interstate 215 that surrounds the City of Las Vegas, known as the Bruce Woodbury Beltway. Pending before the Court is Plaintiff's Emergency Motion for Enforcement of Writ of Mandamus and Request for Sanctions (#74). The Motion (#74) was ripe upon filing. Defendants Las Vegas Paving Corp. and Clark County have filed responses (#83, #85). For the reasons given herein, the Court grants the Motion (#74) in part and denies it in part.

## I.   FACTS AND PROCEDURAL HISTORY

In October 2008, Clark County published an invitation to bid on Bid No. 601309-08 (the "Bid") for improvements to the Bruce Woodbury Beltway from Tenaya Way to Decatur Boulevard in Las Vegas. Clark County received bids from seven contractors, including Fisher Sand & Gravel Co. ("Fisher") and Las Vegas Paving Corp. ("LVP"). Fisher submitted the lowest bid, which was for $112,233,445.50. LVP submitted the second-lowest bid, which was for $116,820,814.40. On

April 21, 2009, the Clark County Board of County Commissioners (the "Board") conducted a hearing on the award. The Board heard arguments from Fisher and LVP. Although Fisher was the lowest bidder, the Board voted 6–1 in favor of awarding the contract to LVP.

The day after the hearing, Fisher filed a lawsuit in state court against Clark County. LVP filed a motion to intervene. The state court granted a temporary restraining order against Clark County and LVP. The state court then held a hearing on Fisher's motion for a preliminary injunction and writ of mandamus. The state court granted Fisher's request for a writ of mandamus on the ground that the Board had considered information raised by LVP more than five days after the bid opened, in violation of law. *See* Nev. Rev. Stat. § 338.142(1). The state court remanded to the Board for rehearing, instructing the Board to exclude consideration of the objectionable information raised by LVP.

On July 21, 2009, the Board met again. The Board opened the proceeding with testimony from an attorney for the International Union of Operating Engineers, Local 12, urging the Board to reject Fisher as the lowest responsible bidder. Local 12's attorney raised charges of federal indictments of several of Fisher's officers. He also raised issues of statutory and regulatory violations by Fisher. The Board then heard testimony by Fisher's attorney and Tommy Fisher, the majority owner of Fisher, who responded to those issues and discussed Fisher's record as a responsible bidder. The Board then inquired about several other issues, including a past complaint to the EEOC for sexual harassment and retaliation and a variety of civil citations from various governmental agencies, including OSHA and MSHA for safety violations, the Arizona Department of Transportation for water violations, and the EPA for environmental violations. After hearing the testimony and questioning Fisher, the Board awarded the contract to LVP in a 5–2 decision.

A week later, Fisher filed the present 42 U.S.C. § 1983 case in state court, requesting a writ of mandamus, injunctive relief, and declaratory relief. The complaint alleged violations of Fisher's due process rights under the Fourteenth Amendment. The crux of Fisher's lawsuit is that the Board

failed to give Fisher proper notice of the issues that the Board would be considering at the July 21, 2009 hearing, denying Fisher the opportunity to refute the allegations made against it. Furthermore, according to Fisher, the Board's actions and ultimate decision against Fisher stemmed from its improper favoritism for local unions and improper influence those local unions exerted on the Board. LVP removed to federal court on the basis of federal question jurisdiction.

On August 24–25, 2009, the Court held a hearing on Fisher's motion for a preliminary injunction and writ of mandamus. At the conclusion of evidence by Fisher, Fisher made an oral motion for a writ of mandamus to: (1) vacate the Board's July 21, 2009 rejection of Fisher's bid on the basis of non-responsibility and award of the bid to LVP; and (2) that the award of the bid be reconsidered "and that Commissioners Steven Sisolak and Tom Collins, by willing agreement, not be allowed to participate in the reconsideration." (#64 at 1:26–2:6). Neither Clark County nor LVP opposed the motion, and the Court granted it in a September 17, 2009 order (the "Writ"). (*Id.*).

The issuance of the Writ, which is in substance a court-approved settlement between Fisher and the County, led to a related lawsuit ("*Fisher II*"). In *Fisher II*, Commissioner Collins sued Clark County in this Court, arguing that his due process rights were violated when the County bargained away his vote without his consent. The Court dismissed *Fisher II* because under United States Supreme Court precedent, as opposed to a citizen's vote for an elected official, there is no due process property or liberty interest in an elected official's own legislative vote. *Snowden v. Hughes*, 321 U.S. 1, 7 (1944) (citing *Taylor v. Beckham*, 178 U.S. 548 (1900)). Collins's appeal is pending.

So Fisher and the Board prepared to meet again. On November 16, 2009, the day before the Board was scheduled to convene to hear the bid for a third time, Fisher asked the Court to issue a temporary restraining order preventing the Board from proceeding, because, despite several requests, the Board had allegedly refused to disclose what information it would be considering at the hearing,

apart from Fisher's application.[1] Fisher argued that this violated the Writ, which mandated, *inter alia*, that the Board give Fisher forewarning of any information it would be considering at the hearing so that Fisher could have a fair and impartial hearing with notice and an opportunity to be heard as required by the Due Process Clause of the Fourteenth Amendment. The Court denied Fisher's request for a temporary restraining order to postpone the hearing until Fisher received notice, because as of November 16, 2009, the Board had not violated the Writ. The Writ required that the Board forewarn Fisher of anything to be considered in connection with Fisher's bid. The Board had the power to restrict what information it revealed, by restricting what information it would consider. So long as the latter did not exceed the former, there would be no violation of the Writ in this regard. As the Court implied in its order, had the Board held the hearing without providing Fisher any information beforehand, it could not have considered any information outside of Fisher's naked application in determining whether it was a responsible bidder.

The Board had a different gambit in mind. On November 17, 2009, the Board summarily rejected all bids, perhaps because it realized it could not likely avoid awarding the bid to Fisher, the lowest bidder, if it followed the dictates of the Writ and the Due Process Clause.[2] Fisher made its presentation indicating its fifty-year history and that it had never been found to be non-responsible, and that the problems Fisher had in Arizona and New Mexico, as noted at the second hearing, were typical regulatory issues experienced by any contractor, including LVP. Fisher stated that LVP was a "responsible, wonderful" contractor, but that all contractors had the kinds of problems Fisher had

---

[1] As noted, *infra*, Fisher's characterization of the Board's failure to provide it with derogatory information to be used against it prior to the meeting is disingenuous because the Board instituted a system whereby all bidders were required to submit such information to the Board for publication to all other bidders and the public generally. (*See* #83, Ex. A).

[2] The Court notes that abandoning the third bid only after due process requirements were imposed is some evidence of bad faith. The Board clearly intended to move forward with this project through at least two successive bids over several months, and it abandoned the project only after due process requirements were imposed by this Court, with no indication that the project had become otherwise impracticable.

experienced. Fisher also noted that it had recently completed a $200 million civil works project right in Clark County, and that the Nevada Department of Transportation ("NDOT") found Fisher to be a responsible contractor and awarded Fisher a highway project in Clark County on September 24, 2009 even after LVP presented the same derogatory information to NDOT that it presented to the Board at the second hearing. After Fisher's presentation, a LVP representative also made a brief presentation asking to be awarded the bid. Commissioner Brown then made a motion to reject all bids to serve the public interest under Nev. Rev. Stat. § 338.1385(6), stating:

> [R]egardless of who we could potentially award this contract to, under the current bidding situation, there is a strong likelihood of continued, expensive litigation that would hold up this project beyond the seven months that this project has already been held up. And then, secondly, given the board's experience on recent bids in the bidding environment in Las Vegas, likewise, I think there's a strong possibility of a lower cost on this project of we rebid it, which definitely would serve the public interest and the taxpayer dollar.

(#74 at 7–12). This motion carried at the end of a seventeen-minute meeting on the rebid of a $117 million dollar project. The only bidder to be heard besides Fisher was LVP, which briefly requested award of the bid. None of the other five bidders made any comments to the Board, and the Board did not discuss the merits of the Bid as between Fisher and LVP.

Fisher has now filed an Emergency Motion for Enforcement of Writ of Mandamus and Request for Sanctions (#74), requesting the Court to: (1) enjoin the publication of any new bids that overlap the bid at issue in this case; (2) declare that Fisher is the lowest, responsible and responsive bidder; (3) rule that remand to the Board for reconsideration would be futile; (4) order that Fisher be awarded the bid; and (5) hold the Board in contempt and grant Fisher sanctions.

## II.    LEGAL STANDARDS

### A.    Declaratory Judgment

Under the Declaratory Judgment Act, 28 U.S.C. § 2201, federal courts "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought," where there is Article III standing, and with a few enumerated

exceptions. § 2201(a). Federal courts have discretion to grant declaratory judgment under the Act, but they have no duty to do so. *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 533 (9th Cir. 2008). A decision not to grant declaratory judgment is reviewed for abuse of discretion. *See id.*

### B.   Injunctive Relief

Under Fed. R. Civ. P. 65(b), plaintiffs must make a showing that immediate and irreparable injury, loss or damage will result to plaintiff if the order is not issued to support their motion for a temporary restraining order. Temporary restraining orders are governed by the same standard applicable to preliminary injunctions. *See Cal. Indep. Sys. Operator Corp. v. Reliant Energy Servs., Inc.*, 181 F. Supp. 2d 1111, 1126 (E.D. Cal. 2001) ("The standard for issuing a preliminary injunction is the same as the standard for issuing a temporary restraining order."). The standard for obtaining *ex parte* relief under Rule 65 is very stringent. *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006). The temporary restraining order "should be restricted to serving [its] underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974).

The Ninth Circuit in the past set forth two separate sets of criteria for determining whether to grant preliminary injunctive relief:

> Under the traditional test, a plaintiff must show: (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases). The alternative test requires that a plaintiff demonstrate either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor.

*Taylor v. Westly*, 488 F.3d 1197, 1200 (9th Cir. 2007). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Id.* The Supreme Court recently reiterated, however, that a plaintiff seeking an injunction must demonstrate that irreparable harm is "*likely*," not just possible. *Winter v. NRDC*,

1  129 S. Ct. 365, 374–76 (2008) (rejecting the Ninth Circuit's alternative "sliding scale" test). The
2  Ninth Circuit has explicitly recognized that its alternative test was overruled by *Winter*, and that
3  "[t]he proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he
4  is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of
5  preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public
6  interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter*, 129 S.
7  Ct. at 374).

### C.     Contempt

The criminal contempt power is statutory. "A court of the United States shall have the power to punish by fine or imprisonment, at is discretion, such contempt of its authority and none other, as . . . (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command." 18 U.S.C. § 401(3). "The criminal contempt power enables judges to fine or imprison persons who willfully violate court orders. Intent is an essential element that must be proved beyond a reasonable doubt." *Yagman v. Republic Ins.*, 987 F.2d 622, 629 (9th Cir. 1993) (quoting *FTC v. Am. Nat'l Cellular*, 868 F.2d 315, 321 (9th Cir. 1989)). A person may not escape criminal contempt by twisted interpretations or tortured constructions of provisions of a court order. *United States v. Greyhound Corp.*, 508 F.2d 529, 532 (7th Cir. 1974). If a person has doubts about his obligations under an order, he may petition the court for clarification of the order. *Id*. (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949)). Failure to petition for clarification combined with actions based upon a "twisted or implausible" interpretation of the order is strong evidence of a willful violation. *Id.* (citing *FTC v. Gladstone*, 450 F.2d 913, 915 (5th Cir. 1971); *United States v. Tijerina*, 412 F.2d 661, 667 (10th Cir. 1969)). Actions showing a good-faith effort to comply with an order tend to negate willfulness. *Id.*  However, delaying tactics, indifference to the order, or mere "paper compliance" will support a finding of willfulness. *Id.*

A federal court's civil contempt power does not derive from statute, but is inherent. *Cal. Dep't Soc. Servs. v. Leavitt*, 523 F.3d 1025, 1033 (9th Cir. 2008) (citing *Shillitani v. United States*, 384 U.S. 364, 370 (1966)). As opposed to criminal contempt, civil contempt may be proved by clear and convincing evidence, and willfulness need not be shown. *NLRB v. Blevins Popcorn Co.*, 659 F.2d 1173, 1183 (D.C. Cir. 1981). A district court's invocation of the contempt power is reviewed for an abuse of discretion. *Id.* (citing *Gifford v. Heckler*, 741 F.2d 263, 266 (9th Cir. 1984)).

**III.   ANALYSIS**

The Writ states in relevant part:

> 2. The matter is remanded to Clark County, Nevada, for Reconsideration and rehearing of Bid Number 601309-08 . . . .
>
> 3. The rehearing of Bid Number 601309-08 . . . shall be conducted in compliance with the Nevada Open Meeting Law, NRS 241, and consistent with fundamentally fair principles including: (1) adequate notice of all specific information that will be considered by the Board of County Commissioners at the time of rehearing to select the lowest, responsive and responsible bidder for Bid Number 601309-08; (2) a fair and full opportunity for each bidder to have their positions heard by the Board of County Commissioners; and (3) a decision from the Board of County Commissioners that gives each bidder equal consideration and is made and based upon information that is provided to parties prior to the rehearing. . . .

(#64 ¶¶ 2–3).

Fisher calls the Board's decision to reject all bids "a crude circumvention of this Court's order." (#74 at 11:10–11). Fisher argues that the decision to summarily reject all bids violated the Writ because there was no prior notice that the following information would be considered in rejecting Fisher's bid (along with the others): (1) the costs of future litigation; and (2) better rates if the Board were to reopen the bid.

This is not the type of information of which the Writ required forewarning. But this does not end the inquiry. It is odd that the Board would consider the costs of future litigation to be a reason to reject all bids. No commissioner who has been paying attention could reasonably have failed to anticipate the present motion by Fisher upon a wholesale rejection of all bids. Nor could

any reasonable commissioner have rationally believed that this Court, after all this litigation, would have entertained any challenge by Fisher to an award to the lowest responsive and responsible bidder if the hearing were held in accordance with the Writ. The Board has discretion in awarding bids, within the limits of the Due Process Clause, and the Court has made clear that it has been offended only by the processes used by the Board in past hearings. This Court and the state district court have both accommodated the Board's failings by giving it a second and third chance to get a simple thing like due process right. The Writ even permitted the Board to consider all the negative information about Fisher it could get its hands on, with the exceedingly simple condition of providing Fisher prior notice of such allegations. Moreover, it is puzzling why the Board held the meeting and permitted Plaintiff and others to make their presentations, only to reject all bids for reasons known to the Board before the meeting and totally unrelated to the merits presented at the meeting. The prospect of continued litigation was known to the Board long before the meeting, and nothing that occurred at the meeting reasonably increased that risk except the Board's own decision to reject all bids. Also, the prospect of obtaining lower bids in the future was an illegitimate reason to reject all bids in light of the fact that there were bidders present, who were not found to be non-responsible, whose bids were as low as or lower than a bid the Board had already accepted twice at previous hearings.

Fisher argues that "the requirement of the Board to award the contract to the lowest responsive and responsible bidder in accordance with the procedures detailed by the Court" was "[i]nherent in this Court's order . . . ." (#74 at 11:21–23 (citing *Gurtler, Herbert & Co. v. Orleans Parish Sch. Bd.*, 251 So. 2d 51 (La. Ct. App. 1971) (holding that a school board could not reject all bids when under an injunctive order preventing it from awarding a contract to other than the lowest bidder))). In *Gurtler, Herbert & Co.*, the Orleans Parish School Board instituted a court action against Gurtler, Hebert and Company, Inc. to determine whether certain proposed action by the board would violate a preliminary injunction. *Id.* at 52. In 1968, the school board had received

public bids for construction and installation of incinerators. *Id.* Gurtler submitted a bid and was found to be the low bidder, but the board voted to reject the plaintiff's bid, finding it not to be a responsible bidder, and instead granted the project to the second-lowest bidder. *Id.* Gurtler sued, and the trial court enjoined the board from entering into a contract for the work with anyone but the lowest bidder according to the bids submitted. *Id.* The trial judge found that the plaintiff was the lowest responsible bidder under the statutes governing responsible bidders, and that the rejection of the plaintiff's bid had been arbitrary. *Id.* The board then held a meeting, at which it voted to reject all bids and re-advertise for the work, in segments, for the reason that "it would stimulate more competitive bidding . . . ." *Id.* at 52–53. Because the preliminary injunction was still in force, the board sued Gurtler for declaratory judgment as to the propriety of the board's actions under the injunction. *Id.* at 53. The trial court dismissed the board's action after a hearing, and the board appealed. *Id.* The court of appeals ruled:

> We note that under the terms of R.S. 38:2212, the public body may reject all bids at its discretion. ***However, we are of the opinion that a public body has this option only prior to the time that it accepts one of the bids it has received. Once the Board accepted [the second-lowest bidder's] bid it waived its right to reject any and all other bids.*** In the case at bar the Board did not choose to reject all bids but rather accepted the bid of, in its opinion, the lowest 'responsible' bidder which was Sargent Gulf, although Gurtler, Hebert was in fact the lowest bidder.

*Id.* (emphasis added); *accord Donahue v. Board of Levee Comm'rs*, 413 So. 2d. 488, 492 (La. 1982). In other words, the court held that accepting any bid operates as a waiver of the ability to reject all bids. The court quoted a relevant treatise on the topic:

> In exercising the power to reject any or all bids, and proceeding anew with the awarding of the contract, the officers cannot act arbitrarily or capriciously, but observe good faith and accord to all bidders just consideration, thus avoiding favoritism, abuse of discretion, or corruption. Even where the right to reject any and all bids is properly reserved, ***the bidding law may not be evaded under color of rejection.*** Although the Courts generally will not disturb an honest exercise of discretion, it has been said that they will intervene to prevent the arbitrary rejection of a bid when its effect is to defeat the object to be attained by competition.

*Id.* (quoting 10 McQuillian, Municipal Corporations § 29.77, at 438–39) (emphasis added). The

court found that the discretion given the board under the Louisiana statutes was intended to be used "to protect the public's interest in receiving quality performance under a contract for the lowest possible price," and that this purpose would be thwarted only if a board were forced to accept a *higher* bid, in lieu of rejecting all bids, after a first acceptance of a bid is vacated for some reason. *Id.* at 54.

This case from Louisiana is very persuasive in the absence of controlling authority, but this Court must look to the law of Nevada for authority. In Nevada, a local board may reject "[a]ny bids received in response to an advertisement for bids . . . if the local government or its authorized representative responsible for awarding the contract determines that: (a) The bidder is not responsive or responsible; (b) The quality of the services, materials, equipment or labor offered does not conform to the approved plans or specifications; or (c) The public interest would be served by such a rejection." Nev. Rev. Stat. § 338.143(5)(a)–(c). The statute permits the rejection of any particular bid in the public interest—the provision invoked by the Board here—but it does not appear on its face to permit an across-the-board rejection of all bids without individualized consideration.[3] Public bodies generally have the ability to reject all bids when the power is granted

---

[3]The County argues that all bids were rejected pursuant to § 338.1385(6)(d), but that statute does not appear to give any broader authority to reject bids than does § 338.143(5)(c). § 338.1385(6) ("Any bids received in response to an advertisement for bids may be rejected if the public body or its authorized representative responsible for awarding the contract determines that . . . [t]he bidder is not a qualified bidder . . . [t]he bidder is not responsive or responsible . . . [t]he quality of the services, materials, equipment or labor offered does not conform to the approved plans or specifications; or . . . the public interest would be served by such a rejection."). This statute does not appear to permit wholesale rejection of all bids, but like § 338.143(5) requires individualized consideration. The County also argues that the Louisiana statute relied upon in *Gurtler* was different from § 338.1385(6)(d), making that case inapposite. The County is half right. The relevant statute in *Gurtler* was indeed different than the Nevada statute; it gave the board there a much broader and clearer mandate to reject all bids than the Nevada statute gives the Board here, *see Gurtler*, 251 So. 2d at 53 ("The governing authority may reject any and all bids." (quoting La. Rev. Stat. Ann. § 38:2212 (1970))), and the *Gurtler* Court proceeded immediately to reject the board's ability to reject all bids where a bid had already been awarded, *see id.* ("We note that under the terms of R.S. 38:2212, the public body may reject all bids at its discretion. However, we are of the opinion that a public body has this

by statute or the right to reject all bids is retained in the bid advertisement. *See* 52 A.L.R. 4th 186, at §§ 3, 5 (1987) (collecting cases). There is controversy over whether a public body has the right to reject all bids absent a statutory grant of authority or explicit retention of the ability in the bid advertisement. *See id.* at § 4. This precise issue has not been widely litigated, but the modern view appears to be that absent statutory or expressly retained authority, a public body cannot reject all bids but must award an advertised bid to the lowest responsible bidder in accordance with what the local statute requires. *See Poling v. Roman*, 207 A.2d 219, 221 (N.J. Super. Ct. Law Div. 1965) (citing *Scatuorchio v. Jersey City Incinerator Auth.*, 100 A.2d 869, 879 (1953)). *But see State ex rel. Hippard v. Comm'rs of Franklin County*, 1 Ohio CC 194 (1885), *aff'd sub nom. State ex rel. Hippard v. Wall*, 19 WL Bull 362. The view that best serves the purposes of due process and the bidding laws is that a public body with a statutory duty to award a published bid to the bidder meeting legislatively predetermined criteria cannot reject all bids wholesale where this option is absent both from the bidding statutes and not advertised in the bid.

The relevant statute here contains no provision permitting a wholesale rejection of all bids, but the invitation to bid did expressly retain the right to reject all bids. The statute states: "Except as otherwise provided in subsection 10 and NRS 338.143, 338.1442 and 338.1446, a local government or its authorized representative ***shall award*** a contract for a public work for which the estimated cost exceeds $250,000 to the contractor who submits the best bid." Nev. Rev. Stat. § 338.147 (emphasis added). Other statutes provide for wholesale rejection of all bids in certain contexts: contracts for the production of medallions and bars, *see* Nev. Rev. Stat. § 253.012(3), sale of real property at public auction, *see* § 244.282(3), lease of county real property, *see* § 244.283(4), sale or lease of certain real property, *see* § 268.062(3), sale of bonds, *see* § 309.230(3), sale or lease of certain lands, *see* § 321.335(6), purchase of property by the state, *see* § 333.350(2)(a), sale or

---

option only prior to the time that it accepts one of the bids it has received.").

lease of school district property, *see* § 393.270(1), lease of grazing rights or sales of agricultural products, *see* § 504.147(4), sale of real property after escheat, *see* § 154.170(3), sale or lease of city-owned electric light and power systems, *see* § 266.3867, construction of highway superstructures under Chapter 403, *see* § 403.490, projects awarded by local improvement districts under Chapter 309, *see* § 309.340, and the State Public Works Board, *see* § 341.145(4). However, the provisions governing garden-variety public contracts grant public bodies no such option. *See* §§ 338.143, 338.147. The invitation to bid on Bid No. 601309-08, dated October 27, 2008, and published in the Las Vegas Review-Journal, reads in relevant part:

> Award shall be made to the lowest responsive, responsible and/or best bidder based upon the Total Bid Amount.
>
> . . . .
>
> Rejection of bid(s) may be recommended to the Governing Body for any of (but not limited to) the following causes: [bid form irregularities, collusion, lack of bid security, omission of additional required forms].

(*See* #85, Ex. J, Invitation to Bid, at 2-7). This language reserves to the Board only the right to reject bids (potentially all of them) for individualized defects. It does not reserve the right to reject all bids wholesale. Later in the bid invitation, however, the right to reject all bids is reserved explicitly: "The Governing Body reserves the right to waive any informality or irregularity in any bid received, to reject any and/or all bids, and to rebid." (*See id.*, Ex. J, at 2-9). However, in light of the absence of statutory authority to reject all bids wholesale and the mandatory statutory language that a body "shall award" bids to the best bidder, it is not clear that the Board had the legal authority to retain the right to reject all bids consistent with Nevada's statutory scheme.

The Board is required by statute to grant bids estimated to be worth over $250,000 to the "best" bidder, which is a higher standard than the "lowest responsible and responsive bidder," which is the standard for bids on projects only estimated to cost over $100,000. *Compare* § 338.147, *with* § 338.143. The "best" bidder is the lowest responsible and responsive bidder with a valid certificate

of eligibility, and whose bid is not more than five percent higher than that of the lowest responsible and responsive bidder who does not have a certificate of eligibility. § 338.147(2)(a)–(b). Here, the Board apparently did not even attempt to determine which bidder was the "best" bidder at the latest hearing, nor did it determine why it would serve the public interest to reject any particular bids. It simply stated that it would be in the public interest to cancel the entire project by rejecting all bids. But as discussed above, the Board did not have the statutory ability to reject all bids wholesale, and it could not create its own authority by attempting to retain an ability it never had. Moreover, even if the statutes provided for the wholesale rejection of bids or the Board was able to retain this ability in the language of the bid advertisement (or create such ability where it did not exist statutorily), here, as in the Louisiana case, this would be an impermissible circumvention of the bidding statutes because the Board had already accepted a bid, and there remained bidders not found to have been non-responsible, and whose bids were equal to or lower than the previously accepted bid. Therefore, rejecting all bids would still be an impermissible circumvention of the bidding laws even if the applicable Nevada bidding statutes permitted wholesale rejection, which they do not appear to do. This maneuver was also a violation of the Writ, which was a court-approved settlement that required a rehearing in substance, not only in form.

The case law surrounding the relevant statutes is sparse and unhelpful in the present context. Only three reported cases mention § 338.143 or § 338.147. First is *Bldg. & Constr. Trades Council of N. Nevada v. State ex rel. Pub. Works Bd.*, 836 P.2d 633 (Nev. 1992), which considered § 338.143. In that case, the Court held that a public university and public works board had a duty to rebid a project rather than negotiate a contract with one of the bidders, after it had formally rejected all bids. *Id.* at 636.[4]  This case is not helpful here, as it does not address whether a local board must

---

[4]This case does not provide support, however, for the proposition that any board may reject all bids wholesale in Nevada. The State Public Works Board in that case had rejected all bids because each of them individually exceeded the project budget. *See Bldg. & Constr. Trades Council of N. Nevada*, 836 P.2d at 607. Furthermore, the State Public Works Board has the

award a bid to some qualified bidder, rather than reject all bids, after the board has already awarded the bid to one bidder and then been ordered to hold a rehearing for due process violations. The second case is *City of Boulder City v. Boulder Excavating, Inc.*, 191 P.3d 1175 (Nev. 2008), which mentions both statutes. That case is even less helpful here. It merely mentions the relevant statutes in a footnote in order to highlight a board's ability to reject bids for various purposes. *Id.* at 1181 n.20. Finally, *Associated Builders & Contractors, Inc. v. S. Nev. Water Auth.*, 979 P.2d 224 (Nev. 1999), considered § 338.147. In that case, the Southern Nevada Water Authority (the "Authority") had adopted a project labor agreement (PLA), with which bidder American Asphalt indicated it would not comply. *Id.* at 226. When the Authority rejected its bid, American Asphalt sued in state court, and the Nevada Supreme Court upheld the district court's ruling that adoption of a PLA was not unlawful, so long as it was adopted in conformity with the objectives of competitive bidding laws. *Id.* at 228. In Nevada, "The purpose of bidding is to secure competition, save public funds, and to guard against favoritism, improvidence and corruption. Such statutes are deemed to be for the benefit of the taxpayers and not the bidders, and are to be construed for the public good." *Id.* at 229 (quoting *Gulf oil Corp. v. Clark County*, 575 P.2d 1332, 1333 (Nev. 1978)). The issue decided in that case is not presented here.

In a related case that does not specifically rely on the statute at issue here, the Nevada Supreme Court noted that it is appropriate for a court to intervene in a public bidding process when a violation of public trust may be involved:

> When the City, of its own volition, decides to award a municipal contract or lease agreement after seeking public bids, the courts should not hesitate to intercede where it is apparent that the bidding process established by the governmental agency, albeit in good faith, destroys the very principles of public policy that form the underlying basis of competitive bidding. The courts should scrutinize the conduct of the bidding process by any governmental agency when it appears that a violation of the public trust may be involved.

---

specific statutory authority to reject all bids. *See* Nev. Rev. Stat. § 341.145(4).

> The principal issue on this appeal is addressed to the propriety of allowing a right of first refusal in a competitive bidding situation, where that right allows one bidding party to obtain an unfair advantage over the remaining bidders. It is a generally recognized principle of law that the purpose of public bidding is to protect the public interest, i.e., to invite competition; to guard against possible favoritism, fraud, or extravagance; and to insure that the public is fully protected.

*Wiener v. City of Reno*, 494 P.2d 277, 281 (Nev. 1972) (citation omitted). Although the Board here invoked the public interest as its ostensible reason for rejecting all bids, it appears that its actions were in reality opposed to the public interest. Although here, unlike in *Wiener*, there was no right of first refusal, the Board has taken every action in its power to avoid awarding this contract to Fisher or even to give Fisher a fair hearing and determination. Plaintiff has always been the lowest bidder. But at the first hearing, the Board awarded the contract to a the second-lowest bidder, LVP, after considering statutorily untimely information. So the state court issued an injunction, requiring a rehearing. Again, the Board awarded the contract to LVP, still the second-highest bidder, after ambushing Fisher, in concert with LVP, with accusations indicating that Fisher was not a responsible bidder. This conclusion may or may not have had merit, but the Court was offended by the lack of due process. So the Court issued a Writ, which was in substance a court-approved settlement, requiring certain due process at the third hearing. At the third hearing, where Fisher was apparently still the lowest bidder, and where the Board was prohibited by the Writ from considering any information on responsibility of which it did not forewarn the pertinent bidder, the Board apparently decided that if LVP couldn't have the project, nobody could. Like a jealous lover who murders the object of his affection so that no one else may have her, the Board killed the repaving project, which it had previously determined was needed to serve the people of Las Vegas, and on which it had previously accepted a bid higher than Fisher's, out of fear that the "wrong" company may win the bid if it comported with the due process this Court demanded. The most amazing part of this narrative is that if the Board truly believed Fisher to be non-responsible—which would likely have been a totally reasonable conclusion if the derogatory information presented by LVP at the

second hearing had been presented or received by the Board at the third hearing without an adequate rebuttal by Plaintiff—it could have so found after a fair hearing, within its discretion, without violating due process or the Writ. The Board could have produced or accepted a mountain of derogatory information about Fisher and discussed it for hours at the third meeting, so long as it provided Fisher with this information beforehand. The fact that no such information was ever discussed at the meeting in order to reach a conclusion about either Fisher's or LVP's fitness is a powerful indication that the Board never intended to hold a hearing on the merits in good faith, but all along intended to withdraw the project by rejecting all bids,[5] and then, of course, rebid the project at a later date, perhaps under circumstances more likely to result in an award of the bid to the "right" company. There is more than a hint of favoritism in this sequence of events.

The Board is charged with serving the public interest. The bidding law defines the contours of this duty with a presumption that it serves the public interest to award bids to the "best" bidder, as defined in the statutes. The Board has the ability under the statutes to reject individual bids if it would serve the public interest, or for other reasons. But the Board cannot reject all bids wholesale "in the public interest," especially when the Board is on its third bid consideration after it has already awarded a bid, and both state and federal courts have, in succession, ordered rehearings based on statutory and due process violations. Even if the Board had the statutory authority to reject all bids wholesale, and even if it had not waived that putative authority by previously accepting a bid, the reasons the Board gave for rejecting all bids at the third hearing are illegitimate or irrational under the circumstances. As discussed above, it is an illegitimate reason to reject all bids in hopes of obtaining lower future bids when the Board has already accepted a bid in a prior hearing, there are bids pending before the Board equal to or lower than that previously accepted bid, and the

---

[5]This is supported by the County's own evidence, indicating that Commissioners Reid and Brown discussed this possibility at a November 3, 2009 hearing on another matter, two weeks before the third hearing on the Bid. (*See* #85, Ex. F, at 10–11).

bidders presenting such bids have not been found to be non-responsible. It is irrational to reject all bids in the hope of avoiding litigation. In this case in particular, rejection of all bids could not reasonably have been expected to lead to any other result than more litigation. Also, after litigation has been initiated, the "reject all bids to avoid more litigation" reasoning serves only to circumvent the bidding rules. If permitted, a board could simply vote to reject all bids "in the public interest" any time a dissatisfied bidder sued it for violations of bidding laws and obtained a rehearing, thereby making enforcement of the bidding laws by the courts practically impossible.

The Board's actions are also in violation of the Writ. It is inconceivable that Fisher would have agreed to a rehearing where the Board had the ability to simply reject all bids based on fear of future litigation and the potential ability to receive lower bids in the future. Once the Writ issued, the Board's discretion was delimited by the Writ, and in any case the Board waived its ability to reject all bids when it previously accepted a bid equal to or higher than bids still pending. The Board was required to hold a fair and impartial hearing, and it in substance held no hearing at all. Fisher had a property interest in being granted the bid if it were the "best" bidder under the mandated hearing. Normally, in Nevada, there is no property interest in a public contract based on a bid before an award is made, because no damages can arise before an award is made. *See City of Boulder City*, 191 P.3d at 1181 n.22. But here, an award had been made to LVP in violation of due process, damaging Plaintiff. To avoid the possibility of a permanent injunction or a money judgment on those alleged damages, the County stipulated to the Writ. The County notes that there is no federally protected due process interest in a bid where there is unfettered discretion to reject any and all bids, but as explained, *supra*, that is not the case here.

LVP's Response (#83) consists largely of argumentation concerning the underlying merits of its responsibility as a bidder and Fisher's alleged non-responsibility. LVP also argues that if the

1  Writ required the Board to award the Bid to some party, then that party should be LVP, or the Court

2  should remand to the Board for such a determination.[6]

3  Finally, LVP argues that although the Board did not notify Fisher directly of any derogatory

4  information to be used against it, it sent letters to all bidders that any information concerning

5  responsibility or responsiveness of any other bidder had to be submitted to the Board's staff by

6  September 30, 2009, so that the staff could make such information available to other bidders and the

7  public on October 2, 2009. (*See* #83 at 4; *id.*, Ex. A). LVP argues that Fisher therefore had access

8  to all allegations that could be considered by the Board and that Fisher in fact filed a rebuttal to

9  some such allegations with the Commission. If true—and the evidence adduced indicates that it

10 is—this goes some way towards showing that the Board did not purposely fail to give Fisher

11 information in anticipation of rejecting all bids. It also indicates that Fisher is selectively admitting

12 facts surrounding the hearing and peering over the ledge of its duty of candor to the Court.

13 Ultimately, however, Fisher complains not of the Board's failure to inform it of certain derogatory

14 information, but of its failure to forewarn Fisher that it would be considering rejecting all bids in the

15 public interest because of the chance of continued litigation and the possibility of receiving lower

16 bids in the future. This type of information was not required to be provided under a reasonable

17 interpretation of the Writ. Regardless, the Board's actions are not in conformity with the relevant

18 statutes and constitute a circumvention of the Writ, which required a fair hearing on the merits.

---

[6]LVP also argues that with Commissioners Collins and Sisolak not participating in the vote, a 4-1 vote would be required to grant any bid, because a majority of the seven-member Board is required. *See* Nev. Rev. Stat. § 241.0355. This question is not before the Court, but it is worth mentioning that LVP's interpretation of the statutory requirements is not necessarily correct. Such an interpretation would eviscerate the relevant portion of the Writ, which is a court-approved settlement between Plaintiffs and the County that two of the seven commissioners would not vote on the bid at the third hearing. If four votes were still needed to award a bid, the exclusion of these two commissioners would be superfluous. Of course, the County may not have the ability to bargain away a statutory limitation on the Board's actions. But again, this question is not before the Court, and LVP and the County likely waived this argument by stipulation to the Writ, in any case.

# CONCLUSION

IT IS HEREBY ORDERED that the Motion (#74) is granted in part and denied in part. The Board did not have the ability to avoid the bidding laws and the Writ under the color of rejecting all bids after it had accepted an earlier bid and was under a court order to hold a fair hearing. Further remand is futile. The Board has had three attempts to comport with the bidding laws and court orders.

IT IS FURTHER ORDERED THAT the Board shall award Bid No. 601309-08 to Fisher Sand & Gravel Co.

IT IS FURTHER ORDERED THAT the Board will not be made to show cause why it should not be held in contempt.

DATED: January 6, 2010

_____
Robert C. Jones
United States District Judge